UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X        Index No. 07 Civ. 00032(JS)(WDW)
ILSA MACHINE CORP. d/b/a                    )
COLUMBIA DRY CLEANING                       )
MACHINES,                                   )
                                            )
                    Plaintiff,              )
                                            )
         -against-                          )
                                            )
SATEC (U.S.A.), LLC,                        )
CLEANERS FAMILY, and ABRAHAM                )
CHO, Individually and in His Official       )
Capacity,                                   )
                                            )
                    Defendants.             )
------------------------------------------------------X

## PLAINTIFF'S AMENDED RULE 56.1 COUNTER-STATEMENT

Plaintiff ILSA MACHINE CORP. ("Ilsa"), by its attorneys, The Law Office of Steven A. Morelli, P.C., as and for its counter-statement of material facts as to which it is contended that there exists a genuine issue to be tried, states, in correspondingly numbered paragraphs in response to Defendants' Rule 56.1 Statement, and in additional subparagraphs, as follows:

## Preliminary Statement

Rule 56.1 of the Local Civil Rules for the Eastern District of New York requires that each statement of fact contained in a moving party's 56.1 statement be "followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Accordingly, Plaintiff notes that Defendants' Rule 56.1 Statement contains many "facts" which are contained in the Declarations of non-party witnesses (namely, Jung Chull Choe and Man Soo Roh),

1

neither of which are signed. As such, the facts contained therein are nothing more than inadmissible hearsay.[1] Therefore, such facts are disputed to the extent that they are not admissible as required by Rule 56.1. Notwithstanding the foregoing, Plaintiff sets forth the following:

1        The facts contained in Defendants' paragraph 1 are undisputed; however, Plaintiff further

asserts that there is no disputed issue of fact regarding the following:

1.1      Abraham Cho and his wife, Esther Cho, are the principal members of Satec (U.S.A.) LLC

("Satec"). (Declaration of Steven A. Morelli dated October 19, 2009, Ex. 1 at ¶¶ 12-13;

Ex. 4 at pp. 4-5; Ex. 7 at pp. 10-11.)[2]

1.2      Jung Chull (J.C.) Choe was the Marketing Director for Satec. (Ex. 11 at ¶ 7 & Exs. 11(3-

10).)

2        The facts contained in Defendants' paragraph 2 are disputed because "Cleaners Family" is

_____

[1]The declarations submitted by Defendants are signed "s/", with no copy of an actual signature being provided, rendering their authenticity questionable. While attorneys generally sign with an "s/" when submitting documents via the ECF system, it is because the act of logging into the ECF system and filing the document under the attorney's personal login number constitutes an electronic signature in and of itself under the ECF rules. However, the declarations submitted by Defendants (with the exception of the declaration of T. Steven Har, Esq., the ECF attorney-filer) containing an "s/" signature are not subject to such rules as they are declarations made by non-party witnesses.

[2]As all of Plaintiffs' exhibits are annexed to the Morelli Declaration, Plaintiff will cite only by exhibit number throughout the remainder of this counter-statement.

merely another name for Satec, which Satec uses when publishing the *Cleaners Family* brochure. It is not a "sole proprietary business entity" as alleged in Defendants' paragraph 2, as set forth below.

2.1     Defendants have produced a number of used checks showing that Satec was doing business as (d/b/a) Cleaners Family. (Ex. 9.)

2.2     When J.C. Choe, the "publisher" of *Cleaners Family* (Ex. 6 at pp. 17), was asked whom he was employed by prior to April 2008, he responded that he was employed by Satec, but "that was actually called Cleaners Family." (Ex. 6 at pp. 13-14.) He further clarified by stating that Satec was the parent corporation of *Cleaners Family*. (*Id.* at pp. 13-14.) He further stated that his paychecks were written by "Satec [(USA)] LLC doing business as Cleaners Family." (*Id.* at pp. 14.) Further, when Mr. Choe stated that "Cleaners Family owned Cleaners Family," and then was asked "Sir, before you said it was Satec U.S.A. was the parent company of Cleaners Family," Mr. Choe responded, "Yes. If you asking it like that it's the same thing, because I was - it was titled doing business as Cleaners Family." (*Id.* at pp. 19-20.)

2.3     Abraham Cho and his wife, Esther Cho, the principal members of Satec, are also the individual owners of the purportedly separate entity, "Cleaners Family." (*Compare* Ex. 1 at ¶ 11 *with* Ex. 2 at ¶ 11; Ex. 7 at pp. 13-14; Ex. 12 at ¶¶ 3, 5). Despite this admission made in Defendants' Answer (Ex. 2), the deposition of Abraham Cho (Ex. 7), and the

3

Certificate of Trade Name sworn to by Abraham Cho and Esther Cho (Ex. 12), J.C. Choe, on behalf of Cleaners Family, swore in Cleaners' Family's responses to Plaintiff's interrogatories that the only owners, directors officers and employees of Defendant Cleaners Family from 2002 to the present were himself and Seoung B. Yuu. (Ex. 4 at pp. 4.)

2.4   Satec and Cleaners Family share a common business address and telephone number. (*Compare* Ex. 1 at ¶ 29(h) *with* Ex. 2 at ¶ 29; *compare* Ex. 3 at ¶ 17 *with* Ex. 4 at ¶ 12.)

3      The facts contained in Defendants' paragraph 3 are disputed. As set forth above, *Cleaners Family* is not an independently operated publication, but is rather Satec doing business as Cleaners Family. Plaintiff incorporates herein the undisputed assertions of fact contained throughout Paragraph 2 above.

3.1   Further, J.C. Choe testified that *Cleaners Family* receives 100% of its funding from Satec. (Ex. 6 at Pages 31-32.)[3]

3.2   Further, in Defendants' Answer to Plaintiff's Amended Complaint, Defendants affirmatively "aver[red] that Cleaners Family is a promotional brochure for Satec and is

---

[3]Exhibit 6 contains both the original deposition transcript of J.C. Choe and the continued deposition transcript of J.C. Choe. Citations to Exhibit 6 designating a page number as "pp." refer to the original deposition transcript. Citations to Exhibit 6 designating a page number as "Page" refer to the continued deposition transcript.

understood to be the same by its readers." (Ex. 2 at ¶ 2.)

3.3   Further, J.C. Choe testified that one of the goals of *Cleaners Family* is to promote Satec and its products and to increase Satec's sales (Ex. 6 at pp. 122-23, 133, Page 23), yet Satec does not pay for any such promotion or advertisements because it fully funds *Cleaners Family* (Ex. 6 at Page 31).

3.4   Further, Mr. Langiulli testified that he has asked several of the advertisers in the *Cleaners Family* magazine how they were contacted or why they appeared in the magazine, and they responded by telling him that Abraham Cho had contacted them. (Ex. 8 at pp. 75.)

4     The facts contained in Defendants' paragraph 4 are disputed. One of the purposes of *Cleaners Family* is to promote Satec and its products (Ex. 6 at pp. 122-23, 133, Page 23), yet Satec does not pay for any such promotion or advertisements because it fully funds *Cleaners Family* (Ex. 6 at Page 31.)

4.1   *Cleaners Family* is an approximately 40-page-long promotional brochure for Satec, which is printed quarterly and distributed free of charge to potential consumers, dry cleaning plans, and tradesmen. (*Compare* Ex. 1 at ¶ 15 *with* Ex. 2 at ¶ 15.)  It is distributed to approximately 14,000 readers annually. (Ex. 6 at pp. 141.) *Cleaners Family* purports to be an unbiased, objective trade publication, but is in actuality a promotional brochure or advertisement for Satec. (Ex. 1 at ¶ 15; *compare* Ex. 1 at ¶ 2 *with* Ex. 2 at ¶ 2.) In fact, if

5

the Court were to visit www.cleanersfamily.com, it would be redirected to Satec's official

website. (http://www.cleanersfamily.com (Last visited October 19, 2009).)

4.2     For example, of the 39 pages of the September 2006, Volume 6, No. 2 *Cleaners Family*

brochure, 30 pages directly or indirectly promoted, solicited, and/or informed the reader of

Satec and its products. (Ex. 1 at ¶ 16; Ex. 1(a)-(b).) The remaining 9 pages consist of

articles and advertisements either promoting products that complement or cross-market

with Satec products, or deter consumers from competitors' products. (Ex. 1 at ¶ 16; Ex.

1(a)-(b).)

4.3     Satec is the largest advertiser in *Cleaners Family*. (Ex. 6 at Page 26.)

4.4     It is also specifically disputed that *Cleaners Family* "contains articles from knowledgeable

sources in the industry," because J.C. Choe testified in his deposition that he is the only

author of the articles that appear in *Cleaners Family*. (Ex. 6 at pp. 142-43.) Mr. Choe also

testified that *Cleaners Family* does not indicate that Mr. Choe is the author of all the

articles because it would be embarrassing for the magazine to admit that it only has one

author. (*Id.* at 143.)

5       The facts contained in Defendants' paragraph 5 are disputed. J.C. Choe claims that he is

the "publisher" of *Cleaners Family* (Ex. 6 at pp. 17); however, he is also the Marketing

Director for Satec (Ex. 11 at ¶ 7 & Exs. 11(3-10)). Plaintiff asserts that the "publisher" of

*Cleaners Family* is, in actuality, Satec, as Satec freely admits that it is doing business as "Cleaners Family" (Ex. 9), *Cleaners Family* is 100% funded by Satec (Ex. 6 at Pages 31-32), Satec and the purportedly separate *Cleaners Family* share a common business address and telephone number (*compare* Ex. 1 at ¶ 29(h) *with* Ex. 2 at ¶ 29; *compare* Ex. 3 at ¶ 17 *with* Ex. 4 at ¶ 12), and the very purpose of *Cleaners Family* is to promote Satec and its products and increase Satec's sales (Ex. 6 at pp. 122-23, 133, Page 23).

6    The facts contained in Defendants' paragraph 6 are undisputed.

7    The facts contained in the first sentence of Defendants' paragraph 7 are disputed to the extent that Defendants aver in their Answer in this litigation that "Cleaners Family is a promotional brochure for Satec and is understood to be the same by its readers." (Ex. 2 at ¶ 2.) Further, Plaintiff specifically incorporates herein its response to Defendants paragraph 4 (*supra*) in order to dispute the remaining allegations set forth in paragraph 7 of Defendants' Rule 56.1 statement.

8    The facts contained in Defendants' paragraph 8 are disputed. J.C. Choe testified that *Cleaners Family* is 100% funded by Satec and that Satec does not pay for any advertisements (Ex. 6 at Pages 31-32), from which the jury can infer that is has no "policy of open advertising" as alleged in Defendants' paragraph 8. However, Plaintiff does not specifically dispute the assertions of fact set forth in the last sentence of Defendants' paragraph 8.

9  The facts contained in Defendants' paragraph 9 are undisputed except to the extent set

forth above in response to Defendants' paragraph 8.

10  The facts contained in Defendants' paragraph 10 are disputed to the extent that J.C. Choe

testified that Satec, the largest advertiser in *Cleaners Family* (Ex. 1 at ¶ 16; Ex. 1(a)-(b)),

does not pay for any of its advertisements (Ex. 6 at Pages 31-32).

11  The facts contained in Defendants' paragraph 11 are disputed. Defendant Abraham Cho

testified that both he and his wife, Ester, own *Cleaners Family* (Ex. 7 at pp. 14) and swore

under oath on a Certificate of Trade Name filed with Monmouth County, New Jersey, that

both he and his wife own *Cleaners Family* (Ex. 10). However, J.C. Choe testified that

*Cleaners Family* is owned by Satec as "the parent corporation" (Ex. 6 at pp. 13-14), and

Satec has produced documents showing that Satec was doing business as Cleaners Family

(Ex. 9), contrary to any assertion that is a separately owned entity. Further to the contrary,

J.C. Choe, on behalf of Cleaners Family, swore in Cleaners' Family's responses to

Plaintiff's interrogatories that the only owners, directors officers and employees of

Defendant Cleaners Family from 2002 to the date of the interrogatories were himself and

Seoung B. Yuu. (Ex. 4 at pp. 4.)

12  The facts contained in Defendants' paragraph 12 are disputed because J.C. Choe testified

that Abraham Cho, as his boss, makes suggestions as to the articles that are going to

appear in *Cleaners Family*. (Ex. 6 at pp. 93-94.) Further, the fact that *Cleaners Family* is controlled by Satec and Abraham Cho can clearly be inferred by the jury because Satec freely admits that it is doing business as "Cleaners Family" (Ex. 9), *Cleaners Family* is 100% funded by Satec (Ex. 6 at Pages 31-32), Satec and the purportedly separate *Cleaners Family* share a common business address and telephone number (*compare* Ex. 1 at ¶ 29(h) *with* Ex. 2 at ¶ 29; *compare* Ex. 3 at ¶ 17 *with* Ex. 4 at ¶ 12), and the very purpose of *Cleaners Family* is to promote Satec and its products and increase Satec's sales (Ex. 6 at pp. 122-23, 133, Page 23).

12.1    It can further be inferred because J.C. Choe testified that when he attends industry trade shows on behalf of Satec and *Cleaners Family*, Satec pays for all of his travel and hotel accommodations. (Ex. 6 at pp. 28, 46.)

12.2    J.C. Choe also testified that there have been times when he wanted to publish an article in *Cleaners Family*, but that Abraham Cho would not let him publish the article, or suggested that Mr. Choe "soften" the language of the article. (Ex. 6 at Page 20.) Abraham Cho admitted to doing the same. (Ex. 7 at pp. 34-35.)

13      The facts contained in Defendants' paragraph 13 are disputed for the same reasons sated above in response to Defendants' paragraph 12.

14      The facts contained in Defendants' paragraph 14 are disputed for the same reasons sated

above in response to Defendants' paragraph 12.

15      The facts contained in Defendants' paragraph 15 are undisputed; however, the authenticity

of the Declaration of Mr. Roh is questioned for the reasons set forth in the preliminary

statement hereto.

16      The facts contained in Defendants' paragraph 16 are undisputed except for the model

number of the machine Mr. Rho claims he purchased. The model number of the machine

Mr. Roh purchased was TLHCS550, not "HC550" as Mr. Roh states in his declaration.

(Ex. 14 at ¶ 4.)

17      The authenticity of Mr. Roh's declaration is questioned for the reasons set forth in the

preliminary statement hereto; as such, the facts contained in Defendants' paragraph 17 are

in dispute.

17.1    Further, as to the actual allegations in paragraph 3 of Mr. Roh's declaration, they are

highly in dispute. First, there is no such thing as a "vaporater coil" in the machine. (Ex. 14

at ¶ 5.) There is, instead, an evaporative coil, and that coil is a Freon-charged coil (Freon is

a gas), with no water or other liquid in it. (*Id.*) The significance of this is that if the

evaporative coil "exploded" as Mr. Roh claims, any Freon in the coil would simply escape

into the atmosphere, thereby leaving nothing left to make the clothes smell as Mr. Roh

claims in paragraph 3 and elsewhere throughout his declaration. (*Id.*) Even if Freon had

10

the ability to disperse into the solvent or onto garments, a bacteria or odor produced by bacteria would not be possible. (*Id.*)

17.2    Furthermore, if the evaporative coil "exploded" as Mr. Roh claims in paragraph 3 of his declaration, necessarily losing its charge of Freon, the machine would not even be able to function, meaning that no clothes could be washed and no smell could be produced. (*Id.* at ¶ 6.)

17.3    Further, Plaintiff takes issue with Mr. Roh's use of the word "explode" in paragraph 3 of his declaration because the evaporative coil could not explode; it could leak, it could rupture, it could split, but it could not "explode." (*Id.* at ¶ 7.)

17.4    Plaintiff further disputes Mr. Roh's assertion in paragraph 3 of his declaration that "[t]he mechanic who sold me the machined [sic] could not be contacted." (Ex. 13 at ¶ 3.) However, Mr. Roh did not purchase the machine from a mechanic, but from an authorized Columbia/ILSA dealer, Uniko Corp. (Ex. 14 at ¶ 8.)

17.5    Further, Stephen Langiulli searched Columbia/ILSA's records to investigate whether Mr. Roh contacted Columbia/ILSA as "the manufacturer" as he claims in paragraph 3 of his declaration, but has discovered that Plaintiff has no record of Mr. Roh ever contacting Plaintiff. (*Id.* at ¶ 9; Ex. 8 at pp. 102-04.) Even if Mr. Roh means that he contacted Ilsa S.p.A., Plaintiff's parent company, as the "manufacturer," that it also disputed because all

calls to Ilsa S.p.A. coming out of North America and South America are routed back to

Plaintiff. (Ex. 14 at ¶ 9; Ex. 8 at pp. 102-04.)

17.6    Further, all Columbia/ILSA machines come with a one-year warranty. (*Id.* at ¶ 10.) Thus,

if Mr. Roh's machine broke within 11 months as stated in paragraph 2 of his declaration

(Ex. 13 at ¶ 2), he would not have been told that the warranty period was over as he claims

in paragraph 3 of his declaration. (Ex. 14 at ¶ 10.) Even if the warranty period was

over–for example, the machine broke within 13 months–Plaintiff has an unwritten policy

of covering such problems. (*Id.*) In short, and based upon the above, Plaintiff highly

disputes that Mr. Roh ever contacted "the manufacturer" about any problems with his

machine, as he claims in his declaration. (*Id.*)

18      The authenticity of Mr. Roh's declaration is questioned for the reasons set forth in the

preliminary statement hereto; as such, the facts contained in Defendants' paragraph 18 are

in dispute.

18.1    Plaintiff also specifically disputes such assertions. Stephen Langiulli explains that

paragraph 4 of Mr. Roh's declaration is equally as confusing as paragraph 3. (*Id.* at ¶ 11.)

Mr. Roh claims that a mechanic came to his store and cleaned the "steam coil and

vaporater coil about three times, but the smell persisted." (Ex. 13 at ¶ 4.) Mr. Langiulli

explains that this assertion makes absolutely no sense in light of the fact that Mr. Roh

claimed the "vaporater coil" "exploded" (Ex. 13 at ¶ 3). (Ex. 14 at ¶ 11.) Assuming Mr.

12

Roh meant that the evaporative coil split or ruptured, "cleaning" the coil would do nothing

to fix that problem anyway because the machine would be inoperable. (*Id.*) Mr. Roh makes

no assertion that anyone ever replaced the broken coil at any point in time. (*Id.*) Simply

put, and as stated above, no smell could have been caused on the clothing due to a broken

evaporative coil because the machine could not even function if the evaporative coil was

broken. (*Id.*)

18.2   The "mechanic" Mr. Roh called to look at his machine (Ex. 13 at ¶ 4) was Peter Preslick

of RAM Parts and Service, 1820 Saddle Hill, Green Oaks, IL. (Ex. 14 at ¶ 12.) Mr.

Langiulli has spoken with Mr. Preslick at length about Mr. Roh's machine and the

allegations Mr. Roh is making. (*Id.*) Mr. Preslick reported to Mr. Langiulli that Mr. Roh's

store, ES Cleaners, froze up (meaning the steam coil incorporated inside the machine

ruptured or split). (*Id.*) This could have occurred only as a result of non-use of the machine

during the winter months and an unheated store. (*Id.*) In other words, Mr. Roh was not

using the machine during the winter months in Chicago, Illinois, and kept his store

unheated during those months, the steam that was in the steam coil turned to water, and

that water, only surrounded by copper tubing, froze due to the cold temperature. (*Id.*) Once

Mr. Roh turned his machine back on, even if he was unaware that the steam coil had

ruptured, he would have recognized there was a problem with the steam coil not by smell

on the clothing, but as a result of damage to the clothes caused by shrinkage. (*Id.*) It is not

possible that a ruptured steam coil would cause any smell on the clothes by itself. (*Id.*)

18.3    Plaintiff is not, however, disputing that Mr. Roh's machine had an odor to it when Mr.

Preslick visited Mr. Roh's store. (*Id.* at ¶ 13.) However, it is the cause of the odor that is

highly in dispute. (*Id.*) The odor could not have been produced by an "exploded"

evaporative coil or a broken steam coil. (*Id.*) The odor in this case was produced by

excessive water being in the system and the fact that Mr. Roh was not using the machine

on a daily basis, which led to that excessive water remaining stagnant, which allowed

bacteria to grow in the stagnant water, which eventually produced mold, which then

produced the odor. (*Id.*; *see* Ex. 1 at ¶¶ 22-24.)


18.4    Mr. Langiulli also testified that the machine was cleaned and sold for a considerable

amount of money and has operated without problems since that time, which the jury can

use to infer that Mr. Roh's assertion that the problems in the machine could not be fixed is

false in its entirety. (NEED CITATION).


18.5    What Mr. Roh testified to in his declaration essentially mirrors what *Cleaners Family*

printed in the article that is the subject of this lawsuit. (*Compare* Ex. 13 *with* Ex. 1(B).)

The September 2006, volume 6, No. 3 *Cleaners Family* brochure ran an article on pages

26-27 misleading readers to believe that Plaintiff's dry-cleaning machine leaves an odor

on the clothes it cleans for which there is no solution. (Ex. 1 at ¶ 18.) According to the

article, this was due to the fact that the machine was able to only reach 550 rpm and, as

such, unable to reach the requisite rpm needed to regulate bacteria growth. (*Id.*). This is

completely contrary to what Mr. Roh testified to in his declaration, which is that the odor

14

problem in his machine was caused by an "exploded" "vaperator coil." (Ex. 13 at ¶ 3.)

18.6    Plaintiff's principal, Mr. Langiulli, declared that he is "utterly lost" at times when

comparing Mr. Roh's declaration and the *Cleaners Family* article because he wonders

whether they attribute any smell in Mr. Roh's machine to a broken steam coil, an

"exploded" evaporative coil, the spinning speed of the drum, or the mount structure of the

machine. (Ex. 14 at ¶ 18.) Plaintiff asserts instead that the article in the *Cleaners Family*

magazine was simply an advertisement for Satec machines, in which Satec disparaged

Plaintiff's machines and falsely attributed an odor problem to the design of Plaintiff's

machine. (*Id.*; *see* Ex. 1 at ¶¶ 18-25; Ex. 8 at pp. 28-33.)

18.7    Satec printed the misleading article in an attempt to tarnish Plaintiff's products and

advertise for Satec's products. (Ex. 1 at ¶ 3.) J.C. Choe testified that the very purpose of

the article was to promote Satec's products. (Ex. 6 at pp. 122-23, 133.)

18.8    The "article" itself includes a telephone number for the nearest Satec dealer (Ex. 1(b) at

pp. 27), which J.C. Choe testified was placed there so that readers could call Satec and

purchase Satec's products (Ex. 6 at pp. 122-23).

18.9    J.C. Choe, the author of the *Cleaners Family* article that is the subject of this lawsuit (Ex.

6 at pp. 100), testified that he only wrote what Mr. Roh reported to him (Ex. 6 at pp. 106,

120).  The point of disputing all of Mr. Rho's assertions is that even if Mr. Roh reported

these assertions to Satec, Satec and J.C. Choe, purportedly professionals in the dry-cleaning industry, should have recognized that Mr. Rho's assertions and conclusions regarding the cause of the odor were not possible. (Ex. 14 at ¶ 14.) In fact, J.C. Choe testified that he undertook no investigation of Mr. Rho's assertions, such as by calling Mr. Preslick or Columbia/ILSA for comment (Ex. 6 at pp. 116, 135, 136). (*See also* Ex. 6 at pp. 118, 119, 135.)

19    The authenticity of Mr. Roh's declaration is questioned for the reasons set forth in the preliminary statement hereto; as such, the facts contained in Defendants' paragraph 19 are in dispute. In addition, Plaintiff specifically disputes the allegations contained in Defendants' paragraph 19 and in Mr. Roh's declaration that Ki Moon Kim was a "Chicago area dealer." (Ex. 13 at ¶ 5.) Mr. Langiulli, Plaintiff's principal, testified that Mr. Kim is not a "Chicago area dealer" but is rather a hanger and plastic bag salesman who sells dry-cleaning supplies. (Ex. 14 at ¶ 15.) Mr. Kim has told Mr. Langiulli that he has never sold dry-cleaning machinery for Satec nor any other company, and that he is simply employed by a dry-cleaning supply company. (*Id.*)

20    The authenticity of Mr. Roh's declaration is questioned for the reasons set forth in the preliminary statement hereto; as such, the facts contained in Defendants' paragraph 20 are in dispute. However, Plaintiff does not specifically dispute the allegations contained in Defendants' paragraph 20.

21      The authenticity of Mr. Roh's declaration is questioned for the reasons set forth in the

preliminary statement hereto; as such, the facts contained in Defendants' paragraph 21 are

in dispute. However, Plaintiff does not specifically dispute the allegations contained in

Defendants' paragraph 21.

22      The authenticity of Mr. Roh's declaration is questioned for the reasons set forth in the

preliminary statement hereto; as such, the facts contained in Defendants' paragraph 22 are

in dispute. However, Plaintiff does not specifically dispute the allegations contained in

Defendants' paragraph 22, except notes that each of the facts contained in Defendants'

paragraph 22 are clearly Mr. Roh's opinion and not assertions of any material fact.

23      The authenticity of Mr. Roh's declaration is questioned for the reasons set forth in the

preliminary statement hereto; as such, the facts contained in Defendants' paragraph 23 are

in dispute. Plaintiff does not specifically dispute most of the allegations contained in

Defendants' paragraph 23, except notes that each of the facts contained in Defendants'

paragraph 23 are clearly Mr. Roh's opinion and not assertions of any material fact.

Plaintiff does specifically dispute Mr. Roh's opinion that Satec "has been the leader in

hyrdrocarbon machines for the past nine years and it continues to offer more improved and

advance [sic] products as a result of continuous research and development in this area"

(Ex. 13 at ¶ 9.) Satec is a company that sells hydrocarbon machines in the industry, but it

is far from being a "leader" in the field. (Ex. 14 at ¶ 16.) Satec's approximate market share

is, at most, 10% in the United States, whereas Columbia/ILSA's approximate market share

is about 25% in the United States. (*Id.*)

24     The authenticity of Mr. Roh's declaration is questioned for the reasons set forth in the

preliminary statement hereto; as such, the facts contained in Defendants' paragraph 24 are

in dispute. However, Plaintiff does not specifically dispute the allegations contained in

Defendants' paragraph 24.

25     The facts contained in Defendants' paragraph 25 are not in dispute. Mr. Choe testified that

he spoke to Mr. Roh (incorrectly identified as Mr. No in Mr. Choe's deposition), Mr. Kim,

and Mr. Chai, who owns another cleaner near Mr. Roh's store. (Ex. 6 at pp. 117.)

However, Mr. Choe also testified whom he did not call. He did not call Columbia/ILSA

(*id.* at pp. 116, 136), he did not call the mechanic who purportedly went to the store to fix

the machine (*id.* at pp. 135), Mr. Preslick (Ex. 14 at ¶ 12), and he did not call any expert to

determine whether Mr. Roh's assertions were true (Ex. 6 at pp. 135). Mr. Choe also

testified that he undertook no investigation of his own to determine whether it was true

that the steam coil in Mr. Roh's machine exploded. (Ex. 6 at pp. 118-19.)

26     The facts contained in Defendants' paragraph 26 are undisputed; however, Plaintiff asserts

there can be no dispute as to any of the material issues of fact set forth below.

26.1    Throughout the article, Satec continually referred to Plaintiff's machine as "the Italian

hydrocarbon machine." (Ex. 1(B) at pp. 26-27.) Satec also published a different "article"

in the *Cleaners Family* brochure on page 18 which contains the following: "Recently, a cleaner in Chicago purchased a name brand hard-mount hydrocarbon machine, but had to dispose of it after one year. The laundry smelled so bad that he/she count not use it at all." (Ex. 1(b) at pp. 18.) J.C. Choe testified that the machine being referred to was Plaintiff's machine. (Ex. 6 at pp. 137.) Satec also published a third article in the *Cleaners Family* brochure also referring to an "Italian brand well known in the US" and also discussing odor problems caused by that machine based upon its hard-mount structure, which causes water to remain in the machine, which is why bacteria and smell occur. (Ex. 1(B) at pp. 25.) Mr. Choe denied in his deposition that the reference in this third article was also to Plaintiff's machine (Ex. 6 at pp. 137-38), though Plaintiff asserts that the jury can infer that Satec is also referring to Plaintiff's machine in this article as well.

27    The facts contained in Defendants' paragraph 27 are undisputed; however, Plaintiff asserts there can be no dispute as to any of the material issues of fact set forth below.

27.1    Accompanying the article in question is a picture of Plaintiff's machine with its trademarked logo blocked out. (Ex. 1(A) at pp. 127.) J.C. Choe admitted this in his deposition. (Ex. 6 at pp. 110-11.) He also testified that he blocked out Plaintiff's logo because he was "obviously" worried about being sued. (Ex. 6 at pp. 131.)

27.2    Although Satec chose to block out Plaintiff's logo in the picture, Plaintiff's machine is clearly identifiable as Plaintiff's machine to the relevant purchasing public. (Ex. 1 at ¶ 19.)

19

27.3    Underneath the photograph of Plaintiff's machine, there is a caption accompanying the

picture. (Ex. 1(A) at pp. 127; Ex. 1(B) at pp. 127; Ex. 6 at pp. 123.) The caption reads:

"The Italian hydrocarbon machine that is being removed after it was used for less than a

year because problems with smell on the clothes could not be solved. Payment still has to

be made for three years. This machine has a hard-mount structure with a dehydration

speed lower than 550 rpm. If the system cleaning function is not available, bacteria will

break out due to inefficient water separation." (Ex. 1(B) at pp. 27.) Mr. Choe testified that

this statement is only his opinion (Ex. 6 at pp. 124, 126, 127), and that the caption to the

picture could mislead the reader to believe that the odor problem with Mr. Roh's machine

was a result of what is printed in the caption (Ex. 6 at pp. 127-28), though clearly Mr. Roh

has testified that he believes the odor problem was caused by an "exploded" "vaporater

coil," which cannot explode and cannot cause such an odor problem (*see, supra,* at ¶¶

17.1-17.3, 18.1).


28      Plaintiff incorporates by reference its response to paragraph 27 (*supra*) in response to

Defendants' paragraph 28.


29      Plaintiff incorporates by reference its response to paragraph 27 (*supra*) in response to

Defendants' paragraph 29.


30      The facts contained in Defendants' paragraph 30 are undisputed to the extent that J.C.

Choe testified that he did not single out one particular Italian brand machine as causing odor problems; however, as alleged throughout the Amended Complaint and as more fully set forth above, Plaintiff respectfully submits that the jury could infer Satec published the misleading article in an attempt to deter consumers from Plaintiff's products and draw them to Satec's products. This is especially so given J.C. Choe's past and proven credibility issues, as set forth below.

30.1   As set forth above, Defendant Abraham Cho testified that both he and his wife, Ester, own *Cleaners Family* (Ex. 7 at pp. 14) and swore under oath on a Certificate of Trade Name filed with Monmouth County, New Jersey, that both he and his wife own *Cleaners Family* (Ex. 10). However, J.C. Choe, on behalf of Cleaners Family, swore in Cleaners' Family's responses to Plaintiff's interrogatories that the only owners, directors officers and employees of Defendant Cleaners Family from 2002 to the date of the interrogatories were himself and Seoung B. Yuu. (Ex. 4 at pp. 4.)

30.2   J.C. Choe also denied being the Marketing Director for Satec and, unbelievably, denies ever working for Satec (Ex. 6 at pp. 20), despite clear evidence to the contrary (Ex. 11 at ¶ 7 & Exs. 11(3-10)). When J.C. Choe met with Mr. Langiulli in or about the summer of 2008, Mr. Langiulli asked Mr. Choe whom he worked for previously, and Mr. Choe responded, "Satec." (Ex. 8 at pp. 15.)

30.3   Plaintiff also alleges that the article itself was strategically placed in the Korean version of

21

the *Cleaners Family* brochure where the likelihood of it being discovered by Plaintiff was significantly lessened. (Ex. 1 at ¶ 20.) In response to this allegation, other than a general denial in Defendants' Answer, J.C. Choe swore in his declaration in support of Defendants' motion to dismiss that "[*Cleaners Family*] only prints one "version" of the magazine, and the single version contains Korean-language articles and, from time to time, English-language articles or translations. Thus, any suggestion that any of our articles was written in the Korean language, so as to be surreptitious is contrary to reality." (Ex. 12 at ¶ 6.) Mr. Choe's statement is completely false. Mr. Langiulli, in response to Mr. Choe's declaration, stated that he has personally seen many *Cleaners Family* magazines published in the English language (Ex. 11 at ¶ 4) and also produced to the Court two such English-only versions (Ex. 11(1)-(2)). *Cleaners Family* also printed, as part of an alleged news story, in the very brochure that is the subject of this lawsuit, that, "About two years ago, [Craig Stuart] happened to read an article on 'Byong Won Cho's new cleaning principal' in the English version of Cleaners Family." (Ex. 1(B) at pp. 31.) When confronted at his deposition with two versions of the *Cleaners Family* brochure printed solely in English, and later the sentence from the *Cleaners Family* magazine admitting there is a separate English version,  Mr. Choe admitted that any previous assertion he made that *Cleaners Family* only prints a Korean-language version was false. (Ex. 6 at pp. 78-79, 85, 87-88.)

31     The facts contained in Defendants' paragraph 31 are disputed, especially because Defendants cite to deposition testimony rather than the article itself. The article is clearly referring to the "Italian hydrocarbon machine" that is in the picture accompanying the

article (Ex. 1(B) at pp. 26-27), which Mr. Choe admitted the reader would assume during

his deposition (Ex. 6 at pp. 128-29).


32       The facts contained in Defendants' paragraph 32 are disputed. Mr. Langiulli testified that

there are only three companies selling Italian-made machines in the United States and that

those companies sell approximately 11 different models. (Ex. 8 at pp. 35-36.)


Dated: Carle Place, New York
         October 19, 2009

                                                    _____s/_____
                                                    Steven A. Morelli
                                                    The Law Office of Steven A. Morelli, P.C.
                                                    *Attorneys for Plaintiff*
                                                    One Old Country Road, Suite 347
                                                    Carle Place, New York 11514
                                                    (516) 393-9151